STATE v. HEMPLEY

(113 S. E. 123)

CRIMINAL LAW—ADMISSION IN EVIDENCE OF ARTICLES OBTAINED WITH-
OUT SEARCH WARRANT HELD PROPER.—In a prosecution for murder,
admitting testimony that officers who searched defendant's room
and trunk without a warrant found cartridges in his trunk, was
not error.

Before TOWNSEND, J., Spartanburg. Affirmed.

A. Fred Hempley convicted of murder with recommendation to mercy, and appeals.

The following are the exceptions of the defendant, other than those included within the opinion:

(1) Because the Court erred in not excluding the Sheriff, along with other witnesses, from the courtroom during the trial upon the request of counsel for the defendant that all witnesses be excluded from the courtroom during the progress of the trial.

(2) Because the Court erred in allowing the witness H. E. Graham to testify to statements made by the Sheriff during the progress of the coroner's investigation when it appeared that such statements were not free and voluntary.

(3) Because the Court erred in allowing over defendant's objection, the witness J. S. Ross to testify to statements

made by the defendant to the sheriff, when it appeared that such statements were not free and voluntary, and were made in the presence of the magistrate, who was acting as coroner during the progress of his investigation.

(4) Because his Honor erred in allowing the witness W. J. Oliver to testify, over defendant's objections, to statements made by the defendant to the sheriff during the progress of the coroner's investigation, and when it appeared that such statements were not free and voluntary.

(5) Because the Court erred in allowing the witness W. J. Oliver to testify over defendant's objection to a statement of the defendant made to the sheriff concerning where the defendant obtained the pistol.

(6) Because the Court erred in permitting the witness William Sackley to testify, over defendant's objection, to a conversation between the deceased and the witness William Sackley.

(7) Because the Court erred in permitting the witness A. G. Keeney to testify to a conversation between the father of the defendant and the defendant in the county jail, the witness A. G. Keeney having been permitted by the sheriff to go along with the father of the defendant and overhear whatever conversation was had between father and son.

(8) Because the Court erred in allowing the witness Frank C. Rogers to testify to deposit slip showing a deposit of $770 made on September 10th by the deceased, when it had no relevancy in the case; the testimony being irrelevant, prejudicial, and tending to mislead the jury.

(9) Because the Court erred in allowing the witness, H. E. Chapman, to testify to transactions with his bank by the defendant when it had no relevancy in the case; the testimony being irrelevant, prejudicial, and tending to mislead the jury.

(10) Because the Court erred in allowing the witness, T. W. Moore, to testify to transaction concerning a chattel mortgage from Davis to him, when it had no relevancy in

the case; the testimony being irrelevant, prejudicial, and tending to mislead the jury.

(11) Because the Court erred in admitting as evidence check for $100 given by the deceased to the defendant, when it had no relevancy in the case, the testimony being irrelevant, prejudicial, and tending to mislead the jury, and for the further reason that it was the same as a written statement by the deceased.

(12) Because the Court erred in allowing the witness, E. W. Brockman, to testify to transaction of the defendant with the bank when it had no relevancy in the case; the testimony being irrelevant, prejudicial, and tending to mislead the jury.

(13) Because the Court erred in allowing the witness, D. W. Thomas, to testify to statements made by the defendant to him and the Sheriff when it appeared that the said statements were not free and voluntary statements.

(17) Because the Court erred in permitting W. J. White, the Sheriff, to testify to statements made by the defendant to him while the Coroner's jury was in session and which statements the Sheriff called upon the defendant to make before the Coroner's jury, and, upon not finding the defendant, had the same statements testified to and reduced to writing before the acting Coroner and sworn to before the said Coroner, when such statement was not free and voluntary, and which was highly prejudicial to the defendant in this case.

(18) Because the Court erred in allowing the Sheriff to testify to statement made to him by the defendant during the investigation by him and the Coroner of the crime when such statements were not free and voluntary.

(19) Because the Court erred in telling the jury during the course of the trial that, "if the statement made by the defendant to the Sheriff was voluntarily and freely made by the defendant, that is for you to consider; if it was voluntarily and freely made, it would be a matter for your

consideration along with the other testimony in the case; but you are to pass upon the question as to whether it was voluntarily and freely made or not," the error being that it is not a question for the jury to pass upon, but a question for the Court to pass upon, and the Court erred in not passing upon this phase of the testimony. ·

(21) Because the Court erred in not allowing the witness, Hattie Wood, to testify to what she said to her sister as the defendant, Hempley, passed in his car, said testimony being competent and beneficial to the defendant.

(22) Because the Court erred in not charging the last part of defendant's request to charge, to wit: "Because it is safer of such events, to err in acquitting than in convicting, or, as the maxim is more popularly expressed, it is better that ten guilty persons shall escape rather than one innocent man should suffer."

(23) Because the Court erred in not charging defendent's fourth request to charge, to wit: "I charge you that, while it is true that circumstantial evidence is frequently satisfactory, it must still be remembered that persons really innocent may be entangled in such circumstances that many times carry great probabilities of guilt when they are absolutely innocent, and that many adverse appearances may be outweighed by a single favorable one, and then all the facts of the case may not be before the Court, and for these reasons, circumstantial evidence must be very carefully and cautiously considered."

(24) Because the Court erred in not charging defendant's ninth request to charge, to wit: "I charge you that arriving at your verdict in this case you must consider the evidence that has been introduced concerning the defendant's previous good character, for evidence that the accused has heretofore borne a good character or good reputation is highly important if the case is doubtful, and I charge you that, if the case hangs in even balance as to whether or not the State has made out its case against the defendant be-

yond a reasonable doubt, then proof of good reputation or good character should make it preponderate in favor of the defendant, and in such case your verdict should be 'not guilty.' "

(25) Because the Court erred in not charging defendant's eleventh request to charge, to wit: "I charge you that circumstances apparently unfavorable to the defendant may be susceptible of explanation consistent with the defendant's innocence, and that circumstances apparently the most conclusive against the defendant may be fabricated by the real defendant in order to keep suspicion from resting upon himself, and to cause it to rest upon another, and for these reasons you should consider circumstantial evidence with extreme care and caution."

(26) The Court should have charged all of defendant's third request to charge, it being a sound and elementary principle of law. This is one of the five main rules laid down by Wills on Circumstantial Evidence, p. 175, and is good law, and should be charged in a case of circumstantial evidence. The refusal to charge this request was highly prejudicial to the defendant.

(27) The Court should have charged the defendant's fourth request, which is good law, and quoted from Wills on Circumstantial Evidence.

(28) The Court should have charged defendant's ninth request to charge. This request is copied from Wills on Circumstantial Evidence, p. 152, and is good law. The refusal to the Judge to charge this request was highly prejudical to the defendant.

(29) The Court should have charged defendant's eleventh request. This charge is practically copied word for word from Wills on Circumstantial Evidence, p. 139, and is one of the best known authorities on the question of circumstantial evidence. The Court should have charged this proposition of law because it is good law, and his

refusal to charge this request was highly prejudicial to the defendant.

*Messrs. Nicholls & Wyche,* for appellant, cite: *Purpose of separating witnesses*: 1 Hill 250; 3 Strob. 33; *Confession must be voluntary*: 1 Strob. 155; 27 S. C. 22; 36 S. C. 524. *Testimony by a party at Coroner's inquest inadmissible against him when on trial*: 32 S. C. 392. *Competency of admission is for the Court:* 9 Rich. 428; 27 S. C., 22; 69 S. C. 72. *Statements by deceased were heresay*: 20 S. C. 581; 32 S. C. 45.

*Messrs. I. C. Blackwood, Solicitor, C. Erskine Daniel* and *Jas. T. Mackey,* for respondent.

July 6, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The following statement appears in the record:

"In this case the defendant was convicted of the murder of one Don Beckoff, and recommended to the mercy of the Court. When the case was called for trial, defendant's counsel made a motion to exclude all the witnesses from the courtroom during the course of the trial. The Court granted this motion as to all the witnesses except the Sheriff and the Coroner, and refused, over the objection of the defendant, to exclude the Sheriff from the courtroom during the course of the trial. The testimony against the defendant was all circumstantial, and, to a great extent, the testimony of damaging statements that the defendant had made to the Sheriff, in the presence of other witnesses, while the Sheriff was investigating the cause of the death of the deceased, during the Coroner's investigation."

The fourteenth, fifteenth, sixteenth, and twentieth exceptions are as follows:

"(14) Because the Court erred in permitting the witness, D. W. Thomas, to testify to a box of cartridges ob-

tained by the Sheriff from the trunk of defendant, when it appeared that the Sheriff had no search warrant to search the living room or. trunk of the defendant, and there obtain evidence against the defendant.

"(15) Because the Court erred in allowing the Sheriff to testify to the same articles when it appeared that he had no search warrant to search the living room or trunk of the defendant to obtain evidence against him.

"(16) Because the Court erred in allowing the witness, D. W. Thomas, to say what was in the box of cartridges that had been obtained from the living room and trunk of the defendant when it appeared that the Sheriff, who obtained the cartridges, had no search warrant to search the trunk or the living room of the defendant."

"(20) Because the Court erred in allowing the Sheriff to testify to what he found in the defendant's room and in his trunk when it appeared that the Sheriff had no search warrant to search the premises or the trunk of the defendant."

In discussing the said exceptions the appellant's attorneys in their argument say:

"These exceptions raise practically the same question. The Court allowed the Sheriff to testify to what he found in defendant's trunk in his private bedroom, which was discovered by the Sheriff while the defendant was incarcerated in the County jail, and the Court allowed the Sheriff to testify to what he found there when it appeared that the Sheriff had no search warrant to search the defendant's property, his trunk, or his room. This testimony was the main and most damaging testimony against the defendant, and upon it the counsel representing the State, laid the greatest stress in their argument. Without it the defendant would never have been convicted."

For the reason that they raise the question upon which the defendant mainly relies, we will discuss them first.

D. W. Thomas, a witness for the State, thus testified:

"On Thursday morning, after the inquest, I went to the residence of I. N. Morgan. I was present at a time when a statement was taken down in writing from Mr. Hempley by myself, and was sworn to before Mr. Hicks. After the statement was signed the defendant went up to his room, accompanied by Officer F. H. Johnson, one of the rural policemen. He was up there three or four minutes before they returned. Mr. Johnson had a pistol in his hand that looked very new to me. That looks very much like the gun. (Exhibit 1.)

"Q. When he returned with Mr. Johnson, what statement, if any, did he make as to his possession of that pistol? How did he say he came into possession of it; did he say?

"Mr. Nicholls: We object, if your Honor please. Our idea is this: Every statement made by this man about the pistol and about other matters was made to officers, and was made under duress. This is our ground of objection.

"The Court: The mere fact that they were made to officers doesn't show that they were made under duress.

"Q. Did he make a voluntary statement? A. Yes, sir.

"Q. Any promise extended him? A. No, sir.

"Q. Any threats imposed upon him? A. No, sir.

"Q. Was it rumored or noised or was it known that he would be arrested at that time? A. No, sir.

"The Court: Was any inducement offered to him to make a statement?

"The Witness: None whatever, sir.

"The Court: How did he come to make a statement?

"The Witness: After saying he didn't own a pistol, he says 'I have got—'

"Mr. Nicholls: You wait; you can't tell that until the Court rules.

"The Court: If that is along with some other statement made to the officers, it is ruled out. If he told them that

he had a pistol, and where it was, and then went and got it, it seems to me he can say how he got it.

"Mr. Blackwood: Q. Did he say he had a pistol? A. Yes, sir; and he said where it was. After that Mr. Johnson went with him, and he said his pistol was in his trunk up stairs in the home of Mrs. Morgan.

"The Court: Then they came back with this pistol you saw there just now?

"The Witness: Yes, sir.

"The Court: Then I think he can tell how he got the pistol."

F. H. Johnson, a witness for the State, testified as follows:

"I am one of the rural policemen in Spartanburg County. I went to Mr. Morgan's residence on Thursday after the finding of Beckoff's body, in company with Sheriff White, D. W. Thomas, and Oliver and Jenkins. I accompanied Mr. Hempley to his room in Mrs. Morgan's house. I got. a pistol there; found it in the bottom of his trunk like. Mr. Hempley said it was there.

"Q. Is this the pistol (handing Exhibit 1 to the witness)?

"Mr. Nichols: We admit it."

W. J. White, the Sheriff, thus testified:

"I saw him (Hempley) go into the house after this statement was made. He was accompanied by Officer F. H. Johnson. When they returned Johnson had a pistol. He said some two or three weeks ago before that time, in the early part of the night, he (Hempley) was coming out of the town of Greer to his home, and that on his way out, just as he got to Marcella street, he saw two young white men, both of whom seemed to be under the influence of whisky, quarreling, and had drawn pistols on each other; that the car passed them just for a short distance, and he stopped and got out, and took the pistol out of the hands of one of them, and the other one walked off and left him,

and he turned around and got back in his car, and the man
he had taken the pistol from following him and asking him
to give him his pistol back, and that he told him he was then
drunk, and who he was, and where he lived, and that as
soon as he got sober if he would come to him sober, he
would give him his pistol back, that he was not going to do
it then.  I examined the pistol at that time, and found it had
five loaded cartridges and one empty shell.  I did not at
that time examine the cartridge box.  I asked him where
he had had the pistol since that time, and he said in his trunk.
*  *  *  Before I got the box of cartridges, I went down
to the jail and asked Fred Hempley if he didn't have a
box of cartridges, and he told me he had, and where they
were, and I went up and got them.  He told me they were
at home in his trunk, and didn't object to my getting them.
He told me he got them at the Spartan Hardware Company.
He told me about it on Sunday and on Monday I went and
got them."

N. B. Genobles, a witness for the State, testified as fol-
lows:

"I am a salesman, Spartan Hardware Company.  I re-
member seeing Mr. Fred Hempley, the defendant, in my
place on Monday prior to the time when Beckoff's body
was found in Inman.  He was there about 6 o'clock in the
afternoon.  I sold him a .32 pistol and a box of cartridges,
$32.50 for the gun and $1.50 for the cartridges, $34 in
all.  That is the check he signed on the Citizens' Bank of
Inman.  It was a .32 long, everybody calls them a 'spe-
cial,' but they are .32.  That is the brand of pistol (Ex-
hibit 1), and that looks like the brand of cartridges.  When
full a box of cartridges contains 50.  Those are .32 long
cartridges.  The Spartan Hardware Company is the only
place in Spartanburg that sells them, that I know of.  We
are supposed to have the sole agency.  I identified Mr.
Hempley after that time in the County jail.  I recognized
him as being the same man.  That is the man to whom I

sold the pistol. It was just about closing time, about 6 o'clock, when I sold it to him."

W. J. Oliver, a witness for the State, testified:

"I have been staying down here with Mr. Graham ever since I came to town. I am engaged in buying and selling produce. I was in Mr. Graham's place on or about the 13th of September, Monday. This is my headquarters when I am in the city. It is my point of distribution. I saw Mr. Beckoff when I was there on this Monday evening, somewhere near 9 o'clock, in the garage. I was right next door to him at Mr. Graham's place with Mr. Jenkins. There was a man with Mr. Beckoff when I saw him last whom I didn't know at that time, but who I afterwards learned, was Mr. Hempley—this gentleman here. I seen no one else with him at the time. He (Hempley) was sitting in the street in the car, and Mr. Beckoff was locking the garage door. I did not see him when he finished fastening the door. I heard the automobile leave, headed toward Mongolia street. I did not see Mr. Beckoff any more after that until I seen him at the inquest. Mr. Hempley was driving. It was a four-seated touring Ford. Just a few minutes before that I seen them not long before that in the garage. I don't know as I could tell what they were doing. They were standing around the front end of the car. As well as I remember, they were fooling or working with the front end of the car. What caused me to investigate what they were doing in there was that I heard the car go in. I was in the store there next door. After I heard it go in I walked over to Henry Perry's and got a ginger ale and come back and looked in the door. Henry Perry's is across the street, almost as close as from here to the door. Graham's store is right beside Beckoff's. I don't know whether Mr. Jenkins saw them at the same time I did or not. The car backed out. It should have backed out, because the back end was sitting near the door, and I don't think it could have turned around. When it left it was

headed down Magnolia street way. Mr. Jenkins was there at the time. The next time I seen Beckoff after that was at the inquest where he was found. He was dead. There was a good crowd there. I saw and recognized Mr. Hempley in that body of people. I had no assistance in recognizing him. I recognized him then and there as being the same man I saw leave the garage at 9 o'clock, or about then. I think he was the last man I ever saw with Beckoff."

The testimony tends to show that the defendant was not only willing for the pistol to be introduced in evidence, but that he actually informed the officers of the law where it could be found, and aided them in the search, which he directed. The testimony of N. B. Genobles explains the reason for his conduct, which was to the effect that the defendant bought a pistol and cartridges from him as salesman about 6 o'clock on Monday afternoon, just before the last time the deceased is known to have been seen alive. The defendant is the last person to have been seen with Beckoff while he was alive, and they were then going off in a vehicle together. This was a strong circumstance tending to show that the defendant had killed him with the pistol he had just bought. The evident purpose of the defendant, in helping to find the pistol, was to show that there was no necessity for him to have purchased a pistol, as he already had one, and thus show that the testimony of Genobles was unworthy of belief. If the jury had drawn the inference from the testimony intended by the appellant, it would have been beneficial instead of prejudicial to him.

In Gr. Ev., § 254a, the rule is thus stated:

"It may be mentioned in this place that, though papers and other subjects of evidence may have been illegally taken from the possession of the party, against whom they are offered, there is no valid objection to their admissibility if they are pertinent to the issue. The Court will not take notice how they were obtained, whether lawfully or un-

lawfully nor will it form an issue to determine that question."

These rulings are approved in the following cases: *State v. Atkinson,* 40 S. C. 363, 18 S. E. 1021, 42 Am. St. Rep. 877; *State v. McIntosh,* 94 S. C. 439, 78 S. E. 327; *State v. Harley,* 107 S. C. 304, 92 S. E. 1034; *State v. Reeves,* 112 S. C. 383, 99 S. E. 841; *State v. Danelly,* 116 S. C. 113, 107 S. E. 149, 14 A. L. R. 1420; *State v. McDuffie,* 113 S. E. 121, just filed.

The foregoing exceptions are overruled.

None of the other exceptions (which will be reported) show prejudicial error; therefore it will not be necessary to consider them in detail, as the same objection is applicable to each of them.

Affirmed.

Mr. JUSTICE COTHRAN and Mr. JUSTICE MARION concur.

Mr. JUSTICE FRASER (concurring) : The appellant's argument states:

"The defendant, Fred Hempley, was convicted of the murder of one Don Beckoff and recommended to the mercy of the Court. The evidence in the case was entirely circumstantial, and consisted largely of statements alleged to have been made by the defendant during the investigation by the Coroner of the cause of the death of the deceased.

## "POINTS AND AUTHORITIES

"Exception 1. The State is the prosecutor of all persons charged with crime. In this case the Sheriff was one of the main witnesses for the State. The defendant requested that the witnesses be segregated because there were some five or six other witnesses for the State summoned to testify to conversations they had had with the defendant in the presence of the Sheriff. That Sheriff had worked up the testimony and had in effect said that he had the man who killed Beckoff. While it has been held in some States that

the Court has the right, in its discretion, to exclude the Sheriff from the witnesses who are to be segregated, we think, in this case, if our State should adopt the principle that it is within the discretion of the Court in such cases, then the Court in this case abused its discretion, especially inasmuch as the presence of the Sheriff in the courtroom during the trial, and in charge of the jury during the recess of the Court, was very harmful to the defendant's right of fair trial, and the Court should have excluded the Sheriff along with the other witnesses, and put the jury in charge of the Deputy Sheriff or some disinterested bailiff.

I. The exclusion of the witnesses was a matter for the sound discretion of the trial Judge. It was the duty of the Sheriff to be in attendance on the Court. Nothing in the record indicates an abuse of discretion.

II. The appellant was sworn as a witness at the Coroner's inquest. He also made statements to the Sheriff and others. His Honor excluded the sworn statements, but admitted the unsworn statement. The appellant alleges that this was error. There is not the slightest evidence of coercion, and there was no error here.

III. The next assignment of error is set out in the nineteenth exception, which is:

"Because the Court erred in telling the jury during the course of the trial that, "if the statement made by the defendant to the Sheriff was voluntarily and freely made by the defendant, that is for you to consider; if it was voluntarily and freely made, it would be a matter for your consideration, along with the other testimony in the case, but you are to pass upon the question as to whether it was voluntarily and freely made or not; the error being that it is not a question for the jury to pass upon, and the Court erred in not passing upon this phase of the testimony."

His Honor admitted the testimony on his own judgment, and then told the jury that, notwithstanding his ruling, still, if the jury thought the statements were not voluntary,

they must disregard the evidence. There was no error in that.

IV. The next assignment of error is that his Honor allowed a witness to tell of a conversation with the deceased. The record shows:

"On Monday afternoon at a little after 2 o'clock he came around and ate dinner at my place and asked me to give it to him.

·"Mr. Nicholls: I object to a conversation between the deceased and this man.

"A. He made a request of me. He asked me for something, and in response to that I gave him what he asked for. It was a small bunch of money, I understand, in an envelope. I had marked on it '350.' He left that either Friday or Saturday previously with me. He came back on Monday after the bank had closed, a little after 2 o'clock, between 2 and 2:30. He had done that on other occasions before. I cashed a check for $200. In other words Beckoff had borrowed $200 off of me on the 7th of September and he gave me his check. I gave him mine. I would hold his. His check was dated the 15th of last September. The check has not yet been made good. In the meantime he was killed on the 13th. The check was dated on the 15th."

As soon as objection was made the witness dropped the conversation and told what he did. This was clearly competent.

V. The appellant complains that the State was allowed to prove that he was making application for loans from several banks. There was no error here, as it tended to show a motive for the alleged crime.

VI. The appellant complains that the State was allowed to put in evidence a box of cartridges taken from his room, without a search warrant, while he was in jail. In the case of the *State v. Harley,* 107 S. C. 307, 92 S. E. 1035, we find:

23 S. C.—120.

"It does not appear that the books and papers in question were illegally seized, but even if they had been so seized, they nevertheless would have been admissible in evidence. *State v. Atkinson,* 40 S. C. 363, 18 S. E. 1021, 42 Am. St. Rep. 877; *State v. McIntosh,* 94 S. C. 439, 78 S. E. 327."

In the case of the *State v. Quinn,* 111 S. C. 180, 97 S. E. 64, 3 A. L. R. 1500, we find:

"There was no search in the instant case, for search implies invasion and quest, and that implies some * * * force, actual or constructive, much or little."

The appellant told the Sheriff just where the box of cartridges were, and he went to the place where the appellant said they were, and got them. There was not the slightest evidence of force or protest. The assignment of error cannot be sustained.

VII. The twenty-first exception is:

"Because the Court erred in not allowing the witness Hattie Woods to testify to what she said to her sister as the defendant, Hempley, passed in his car, said testimony being competent and beneficial to the defendant."

This was clearly incompetent.

VIII. Appellant again complains that the presiding Judge refused to caution the jury against the danger of convicting on circumstantial evidence. Practically the request required the Judge to charge on the weight of evidence, and this, of course, he could not do. It required no citation of authority to show that the weight of evidence is a matter for the jury.

The judgment is affirmed.